UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                       )
ATLANTIC SPECIALTY INSURANCE           )
COMPANY,                               )
                                       )
              Plaintiff,               )
                                       )
      v.                               )          CIVIL ACTION
                                       )          NO. 19-11219-WGY
KARL'S BOAT SHOP, INC., KBS REALTY     )
TRUST, and KARL E. ANDERSON,           )
                                       )
              Defendants.              )
_____)
```

YOUNG, D.J.                                        August 20, 2020

**MEMORANDUM AND ORDER**

## I.  INTRODUCTION

This case concerns the duties owed by the owner of a business to its insurer under maritime and Massachusetts law. Before the Court is Atlantic Specialty Insurance Company's ("Atlantic Specialty") motion for summary judgment.  Pl.'s Mot. Sum. J., ECF No. 24; Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s Mem."), ECF No. 25.  The defendants, Karl's Boat Shop, Inc. ("Karl's"), KBS Realty Trust (the "Trust") and Karl E. Anderson ("Anderson") (collectively "KBS") oppose the motion, and cross-move for summary judgment.  See Defs.' Mem. Opp'n Pl.'s Mot. Summ. J. ("Defs.' Opp'n") 2, ECF No. 28.

On May 31, 2019, Atlantic Specialty, an insurance underwriter, brought the present action for declaratory relief against KBS for Misrepresentation of Material Fact (Count I) and Violation of the Doctrine of Uberrimae Fidei (Count II).  See generally Compl., ECF No. 1.

Anderson, the owner of Karl's Boat Shop and the trustee of KBS, operates a boat yard and marina that offers the storage of vessels as a service.  Compl. ¶¶ 5-7.  Atlantic Specialty alleged that it issued an insurance contract to KBS, under which KBS was required to cause all owners of vessels stored at its facility to execute a waiver indemnifying it (and thus Atlantic Specialty) from claims.  Compl. ¶¶ 8-9, 18-19.  Atlantic Specialty then alleged that KBS routinely failed to require vessel owners to sign the waivers, a material breach of their contract.  Id. ¶¶ 21-25.  When a fire broke out at a KBS storage barn damaging the vessels stored therein, multiple third parties threatened KBS with claims, Answer to Compl. Karl E. Anderson ("Answer") ¶ 29, ECF No. 9,[1] and KBS in turn requested that Atlantic Specialty defend and indemnify it.  Compl. ¶¶ 26-32. Atlantic Specialty therefore requests a Declaratory Judgment that would allow it to void its contract with KBS, and thus deny coverage of these third-party claims.  Id. 10-11.

---

[1] The three Defendants, who are all alter egos of Anderson, filed identical Answers.  See ECF Nos. 9-11.

Both parties have filed Statements of Material Fact.  Pl.'s Statement Material Fact L.R. 56.1 ("Pl.'s SOF"), ECF No. 26; Defs.' Opp'n, Attach. 3, Statement of Disputed and Undisputed Facts ("Defs.' Disputed Facts) and ("Defs.' SOF"), ECF No. 28-3. Atlantic Specialty has filed a Reply and a response disputing KBS's characterization of the facts.  See Pl.'s Reply, ECF No. 31; Pl.'s Statement Material Facts L.R. 56.1 re Mot. Sum. J. ("Pl.'s Response SOF").

Based on the undisputed facts in the record, and taking all reasonable inferences in favor of the non-moving party KBS, Atlantic Specialty has met its burden of showing that KBS breached its insurance contract under the maritime doctrines of uberrimae fidei and the warranty of truthfulness.  Accordingly, this court GRANTS summary judgment in favor of Atlantic Specialty, and DENIES KBS's cross-motion for summary judgment.

## II.  UNDISPUTED FACTS

Atlantic Specialty is an insurance company organized under the laws of New York, with its principal place of business in Plymouth, Minnesota.  Pl.'s SOF ¶ 1.  Karl Anderson is the sole officer of Karl's as well as the trustee of KBS Realty, and all entities are organized and operate in Massachusetts.  Id. at ¶¶ 2-4.

Karl's is located at 50 Great Western Road, Harwich, Mass., about two miles from any navigable waterway.  Defs.' Opp'n, Ex.

1, Affidavit of Karl Anderson ("Anderson Affidavit") ¶¶ 1-2.
The focus of the business is the maintenance and repair of
recreational boats, including painting, cleaning, and hull and
deck repair, and annual launching and hauling of some boats from
moorings or docks.  Id. ¶¶ 3-5.  Karl's stores boats at a barn
at 411 Upper County Road ("the Barn") and must haul boats
overland to transport them to both locations.  Id. ¶¶ 6-7.

KBS applied for insurance from Atlantic Specialty (under
its trademark "International Marine Underwriters") on January
15, 2015, see Defs.' Opp'n, Attach. 5, National Marina Program
Application ("2015 Application"), ECF No. 28-2, and Atlantic
Specialty issued the original insurance policy between these
parties in February 2015, id., Attach. 6, Insurance Policy
B5JH54698 ("2015 Insurance Policy"), ECF No. 28-2.  Atlantic
Specialty renewed the policy for 2016, 2017, and 2018 without
requiring reapplication.  See Defs.' Opp'n, Ex. 1, Affidavit of
Karl Anderson ("Anderson Affidavit") ¶¶ 17-18.  The policy at
issue in the current case ran from January 16, 2018 to January
16, 2019.  See Compl., Ex. A, Insurance Policy B5JH54698 ("2018
Insurance Policy"), ECF No. 1-1.  KBS had also received
insurance from International Marine Underwriters from 2010 to
2014.  Anderson Affidavit ¶¶ 8-9, 14-15.

On February 9, 2016, Atlantic Specialty sent a loss control
specialist, Robert Loring, to conduct a survey of KBS.  Pl.'s

4

SOF ¶ 9; id., Attach. 1, Decl. of Russell Bond ("Bond Decl.") ¶¶ 15-16, ECF No. 26-1.  Loring identified six areas for improvement and provided them to KBS, which faxed back a document to International Marine Underwriters in June of 2016, acknowledging its receipt and its plans for improvement.  Bond Decl. ¶¶ 19-20; Anderson Affidavit ¶ 19; Pl.'s SOF, Ex. A., Loss Control Survey Recommendations ("2016 Loss Fax"), ECF No. 26-2. The heading of the loss control recommendation states, "[f]ailure to respond may jeopardize your insurance coverage." Id. at 2.  It makes six recommendations, each of which is labelled "Recommendation Grade: Necessary," all using language indicating a particular change "should be" implemented.  Id. at 3-4.  One of these recommendations was for a Boat Storage Agreement, stating:

> A boat storage agreement should be instituted.  The agreement should require that boat owners provide proof of insurance and the agreement should have hold harmless and indemnification language.  Legal counsel should be consulted for proper wording to ensure that it complies with state and local statutes.

Id.  KBS stated for this recommendation "Enclosed," id. at 3, and included in the fax two documents, a waiver ("Waiver") and short-term storage contract ("Storage Contract"), id. at 5-6.

The Waiver states in pertinent part:

> In contracting with Karl's Boat Shop, Inc., I recognize and accept that there are certain elements of risk that exist . . . I will in no way hold Karl's

> Boat Shop, Inc. responsible for any such damage that
> may occur during the handling of my boat.

Id. at 5.  The Storage Contract similarly states:

> Karl's Boat Shop, Inc. assumes no responsibility for
> loss or damage to vessels, engines, or articles left
> onboard in case of fire, theft, rodents, damage,
> exposure to the elements, acts of God, or any other
> cause however arising.

Id. at 6.

KBS had once before completed a similar loss control
compliance form, in 2010.  See Anderson Dep. ¶¶ 8-14.  The 2010
loss control survey, directed by International Marine
Underwriters, also recommended the implementation of a boat
storage agreement, and KBS included a similar Waiver and Storage
Agreement in its response to that survey that contained an
identical disclaimer.  See Defs.' Opp'n, Attach. 2, Loss Control
Survey Recommendations ("2010 Loss Fax"), 4-6, ECF No. 28-2.

At his deposition, Karl Anderson testified that the 2010
fax was actually sent by his employee Heather Brown, that she
had filled out the responses to the recommendations, and that he
was unsure whether he had authorized her to sign his name on it.
Pl.'s SOF, Ex. 23, Dep. of Karl Anderson 47:10-50:5, ECF No. 26-
26.  He also stated that he specifically instructed her in 2010
to have all customers execute the waiver and storage agreements.
Id., Ex. 24, Dep. of Karl Anderson 67:9-67:20.  He did not,
however, periodically check to ensure she was actually

complying.  Id., Ex. 24, Dep. of Karl Anderson 67:23-68:9, ECF
No 26-29.  Anderson does not specify if he signed the 2016
response, but this Court infers that he did so because the
handwriting is different than the 2010 response, and Anderson
acknowledges intentionally sending that fax.  See 2016 Loss Fax;
Pl.'s SOF, Ex. 5, Dep. of Karl Anderson at 64:3-64:20, ECF No.
26-7.

On or about June 2, 2018, a fire occurred at the Barn.
Pl.'s SOF ¶¶ 32-33.  Atlantic Specialty eventually paid KBS
$221,347 for damage to the property and related expenses.  Pl.'s
Reply, Ex. 1, Decl. Russell Bond ("Second Bond Decl.") ¶¶ 7-8,
ECF No. 31-1.

Multiple vessels owned by third parties also were damaged
in the fire.  Id. ¶¶ 33-34.  Several of these third parties
communicated to KBS that they intended to seek compensation, and
one of these parties filed suit.  See Pl.'s SOF, Ex. 14, Wianno
Senior # 184 Claim of Compensation, ECF No. 26-16; id., Ex. 15,
Kennedy Letter, ECF No. 26-17; id., Ex. 16, Chubb Insurance
Letter, ECF No. 26-18; id., Ex. 17, Complaint, ACE American
Insurance Company et. al. v. Karl's Boat Shop, Inc. ("ACE
Complaint"), 19-cv-12521, ECF No. 26-19.  KBS requested that
Atlantic Specialty provide it with defense and indemnity
regarding these third-party claims, pursuant to the 2018
Insurance Policy.  Pl.'s SOF ¶ 36.

Atlantic Specialty investigated. In response to
interrogatories by Atlantic Specialty, KBS admitted it had no
records indicating the parties who brought third party claims
for fire damage had executed the Waiver or Storage Agreements.
Pl.'s SOF, Ex. 19, Def.'s Responses Request Admission ("Def.'s
Admissions") Responses 6, 10, ECF No. 26-21.  KBS stated that
Heather Brown was the one responsible for ensuring that KBS
obtained these executed documents, but that she "was terminated
from employment under circumstances which suggest she will not
be cooperative with KBS in determining whether customers signed
the relevant documents."  Pl.'s SOF, Ex. 21, Def.'s Response
Interrogatories 15-23, ECF No. 26-24.

Anderson was unsure whether Brown was working for KBS in
June of 2016, when it submitted the 2016 Loss Fax.  Id., Ex. 25,
Anderson Dep. 35:12-35:16, ECF No. 26-28.  KBS eventually fired
her -- around 2017, to Anderson's best recollection -- based in
part on "fishy" accounting irregularities and inconsistencies in
payroll.  Id., Ex. 27, Dep. of Karl Anderson 32:19-34:8, ECF No.
26-30.  Anderson did not name any other employees as responsible
for seeing to the execution of the paperwork after Brown left,
though he claims that Brown was responsible for seeing to the
execution of all paperwork "in the relevant time."  Def.'s
Response Interrogatories 15-23, ECF No. 26-24.

Both parties purport to dispute the material facts submitted by the other party.  See Defs.' Disputed Facts, Pl.'s Reply Defs.' SOF.  On closer examination, however, most of these purported disputes merely amount to different characterizations of the underlying undisputed evidence.  The sole exception is KBS's dispute of Atlantic Specialty's statement that the third parties "were not required or did not actually execute the Storage Agreement and Waiver."  Pl.'s SOF ¶ 37; Defs.' Disputed Facts ¶¶ 37.  KBS states that the evidence does not support such a broad conclusion, and is correct insofar as Atlantic Specialty's statement is an inference rather than a fact.  Defs.' Disputed Facts ¶¶ 37.  KBS has, however, produced no evidence indicating the documents ever were signed.  Id.  Thus, it has not actually disputed the inference, and there are no genuine disputes of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting).

## III. ANALYSIS

### A.   Summary Judgment

Summary judgment is appropriate on any claim for which there is no genuine dispute of material fact and one party is entitled to judgment as matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the burden of proving it is entitled to summary judgment.  Celotex Corp., 477 U.S. at 330 (Brennan, J., dissenting).  That party, if it bears the burden at trial as is

9

the case here, has an initial burden of producing incontrovertible[2] prima facie evidence of its claims.  <u>Id.</u> at 331.  Once it has done so the non-moving party has the burden of producing evidence creating a "genuine issue" of dispute.  <u>Id.</u>; <u>Blackstone Headwaters Coalition, Inc.</u> v. <u>Gallo Builders</u>, 410 F. 3d 299, 302 (1st Cir. 2019).

A fact is material if it "has the potential to change the outcome of the suit."  <u>Calero-Cerezo</u> v. <u>United States Dep't of Justice</u>, 355 F.3d 6, 19 (1st Cir. 2004) (<u>citing Parrilla-Burgos</u> v. <u>Hernandez-Rivera</u>, 108 F.3d 445, 448 (1st Cir. 1997)).  A genuine dispute exists if the evidence is "sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side."  <u>National Amusements, Inc.</u> v. <u>Town of Dedham</u>, 43 F.3d 731, 735 (1st Cir. 1995).  If there are no genuine disputes of material fact, the court reviews the record in the light most flattering to the nonmoving party, taking all reasonable inferences in that party's favor.  <u>Maldonado-Denis</u> v. <u>Castillo-Rodriguez</u>, 23 F.3d 576, 581 (1st Cir. 1994).  The court is not required, however, to make unreasonable inferences in

---

[2] This is so because, even were the evidence supporting the party with the burden of proof uncontroverted, the fact finder could choose to disbelieve it.  <u>Reeves</u> v. <u>Sanderson Plumbing Prod., Inc.</u>, 530 U.S. 133, 151 (2000).

.

favor of the nonmoving party if the factual record supports only one interpretation.  <u>Scott</u> v. <u>Harris</u>, 550 U.S. 372, 380 (2007).

### B.  Jurisdiction

Atlantic Specialty asserts that this Court has maritime jurisdiction because the underlying insurance contract is for marine insurance.  <u>See</u> Compl. ¶ 2; Pl.'s Mem. 9-10.  KBS argues that the insurance contract is not actually for marine insurance because it concerns the insurance of a storage facility located inland.  Defs.' Opp'n 7-8.

Atlantic Specialty is correct.  Since the dispute is maritime in nature this Court has jurisdiction pursuant to 28 U.S.C. § 1333, and federal admiralty law controls.  <u>See</u> <u>Central Int'l Co.</u> v. <u>Kemper Nat'l Ins. Cos.</u>, 202 F.3d 372, 373-374 (1st Cir. 2000).[3]

Atlantic Specialty argues that the 2018 Insurance Policy is a "marine insurance policy" because it concerns watercraft that are inherently covered by maritime jurisdiction.  Pl.'s Mem. at 9 (citing <u>Essex Ins. Co.</u> v. <u>Detroit Bulk Storage, Inc.</u>, 11-CV-

_____

[3] This Court has jurisdiction over all three KBS entities. KBS argues KBS Realty Trust, as a trust, may not be sued under Massachusetts law, Defs.' Opp'n 1 n.1 (citing <u>Morrison</u> v. <u>Lennett</u>, 415 Mass. 857, 859-860 (1993)), but business trusts in Massachusetts may be sued.  Mass. Gen. L. ch. 182, § 6.  KBS Realty Trust is a nominee trust, Compl. ¶ 6, one of the types of trust that are not immune from suit.  <u>Apahouser Lock & Sec. Corp.</u> v. <u>Carvelli</u>, 26 Mass. App. Ct. 385, 388 (Mass. App. Ct. 1988).

13277, 2012 WL 1893514, at *3 (E.D. Mich. May 23, 2012); Catlin
at Lloyd's v. San Juan Towing & Marine, 778 F.3d 69, 80-82 (1st
Cir. 2015)).  In particular, Atlantic Specialty points to
language in the policy providing coverage to "Marina Operators"
for "loss or damage to boats," see 2018 Insurance Policy 12, for
Protection and Indemnity arising from "the ownership or
operation of watercraft," id. at 14, and coverage of "watercraft
. . . against all risks of direct physical loss of, or damage
to, the watercraft insured from any external cause," id. at 103.

      KBS disputes that the underlying policy is a "marine
contract," arguing that only three pages of the policy deal with
maritime aspects, and that is it not a "Marina Operator."
Defs.' Opp'n at 7.  KBS notes that its facilities are two miles
from any navigable waterway and that it conducts no maritime
operations from the barn location.  Id. at 8.  It argues that
"[s]imply designating an insurance contract as 'marine' is
insufficient to invoke admiralty jurisdiction," id., and that
even a contract with an actual marina intended to insure
property is not necessarily maritime, id. (citing Hartford Fire
Ins. Co. v. Harborview Marina & Yacht Club Community Ass., Inc.,
Civ. No. PJM 16-769, 2016 WL 7178304 (D. Md., Dec. 9, 2016)).
KBS concludes that instead of looking at the labels on the
policy, this Court ought ask "whether the nature of the

transaction was maritime." Id. (quoting Exxon Corp. v. Central
Gulf Lines, Inc., 500 U.S. 603, 611 (1991)).

Issues of contract interpretation are matter of law, see
Lloyd's of London v. Pagan Sanchez, 539 F.3d 19, 22 (1st Cir.
2008), and all material facts relevant to the jurisdiction
inquiry are undisputed.[4]

"The boundaries of admiralty jurisdiction over contracts —-
as opposed to torts or crimes —- being conceptual rather than
spatial, have always been difficult to draw." Kossick v. United
Fruit Co., 365 U.S. 731, 735 (1961).  A contract may be maritime
in nature, even if it involves activity on land, if "the
principal objective . . . is maritime commerce." Norfolk
Southern Railway Co. v. Kirby, 543 U.S. 14, 25 (2004) (holding
that a single contract for transportation of goods over both sea
and rail was maritime).  The rule from Kirby is called the
"primary objective test." See Sentry Select Ins. Co. v. Royal
Ins. Co. of Am., 481 F.3d 1208, 1218 (9th Cir. 2007).
"Ultimately, coverage determines whether a policy is 'marine
insurance,' and coverage is a function of the terms of the
insurance contract and the nature of the business insured."

---

[4] The sole "disputed" fact with respect to the contract is
whether Karl's Boat Yard is a "marina." Defs.' Opp'n 7.  This
is not a material fact because the name of the facility is not
material to the jurisdiction analysis.

Folksamerica Reinsurance Co. v. Clean Water of N.Y., Inc., 413
F.3d 307, 317 (2d Cir. 2005).

Courts have differed since the Kirby decision on how to
implement an exact test for determining when an insurance
contract's "primary objective" is maritime.  See Philip Michael
Powell, The Mixed Up Exercise of Admiralty Jurisdiction Over
Mixed Contracts, Namely Umbrella Insurance Policies Covering
Shore-side and Seaside Risks, 20 Ocean & Coastal L. J. 1, 24-38
(2015).  The First Circuit itself has not applied the
jurisdiction test from Kirby to a mixed insurance contract
covering both land and sea components, though other district
courts in this circuit have.  See, e.g., Catlin (Syndicate 2003)
at Lloyd's v. San Juan Towing & Marine Servs., 946 F. Supp. 2d
256, 262 (D. P.R. 2013).

It is therefore useful to examine the methodologies used by
other Circuits to analyze maritime contracts.  The tests from
the Second and Sixth Circuit are the most distinct and
straightforward. Powell, Mixed Up Exercise at 25, 28.  Both
tests would ultimately impose maritime jurisdiction on these
facts.

The Sixth Circuit looks at the contract as a whole.  New
Hampshire Ins. Co. v. Home Savings and Loan Co. of Youngstown,
Ohio, et. al., 581 F.3d 420, 425 (6th Cir. 2009).  In New
Hampshire Ins. it explained its approach as follows: "the Court

14

has endorsed a 'conceptual' approach, encouraging courts to consider the contract as a whole and instructing that we should look for guidance in analogous precedent." Id. at 427 (citing Kossick, 365 U.S. at 735).  The Sixth Circuit noted that this inquiry looks at both the "interests insured" and the "risks insured against." Id.  In applying this test, the court determined that a policy for the insurance of a marina and yacht dealership that included a truth-in-lending provisions did not have, as its primary objective, maritime commerce. Id. at 423. This was because, the court reasoned, the yacht dealership dealt in vessels as stock for sale rather than instruments of maritime commerce, id. at 424, and because the non-maritime elements of the contract predominated the portion covering the marina, id. at 428-30 (noting that, while the marina operations did include the harboring and launching of vessels, they excluded owned watercraft and pollution).  The Court concluded that the contract's primary objective was to protect the businesses as businesses and as fixed structures. Id. at 431.

The Second Circuit engages in a two-step inquiry. See Folksamerica, 413 F.3d at 312.  It first conducts a threshold inquiry asking whether the dispute itself is maritime in nature. Id.  If the dispute itself is not maritime, the Second Circuit does not impose maritime jurisdiction, even if the overall contract is maritime in nature. Id.  (citing Atlantic Mut. Ins.

15

Co. v. Balfour Maclaine Int'l, Ltd., 968 F.2d 196, 200 (2d Cir.
1992) (ruling that a dispute over stolen coffee cargo in storage
was not covered by admiralty jurisdiction because the coffee had
not yet entered the stream of maritime commerce)).  Only after
conducting this threshold inquiry does the Second Circuit engage
in an analysis of the "primary objective" of a contract to see
if it is maritime commerce.  Id. at 315.  In Folksamerica, the
court first determined that a dispute over a "a ship-
maintenance-related injury sustained by a ship oil-tank cleaner
aboard an ocean-going vessel in navigable waters" passed the
threshold inquiry.  Id. at 313.  It then analyzed the contract
between the parties, determining that a commercial general
liability policy was maritime in nature because it included
coverage of several traditional maritime risks including
pollution and the operation of vessels.  Id. at 318-19.  The
Second Circuit's reasoning at the second step of discerning the
contract's primary objective does not differ from other
circuits.

     There are upsides and downsides to both approaches.  The
Second Circuit's test has the benefit of avoiding arguably
absurd results.  For example, in Catlin, the United States
District Court for the District of Puerto Rico conducted an
inquiry essentially the same as the Sixth Circuit's test and
ruled that the sinking of a floating drydock was covered by

maritime jurisdiction (regardless of whether it was a "vessel")
because it was designed to engage in maritime commerce by
providing repairs and maintenance to ships.  946 F. Supp. 2d at
264-67.  Destruction of a shoreside facility, whether by fire or
water, does not inherently fall under maritime jurisdiction, see
New Hampshire Co., 581 F.3d at 429, and there is no
jurisdictional difference between a floating facility and a
shoreside one, Exxon Corp., 500 U.S. at 611, so the reasoning
from Catlin suggests that, hypothetically, if the current
dispute were over the fire damage to the barn instead of the
vessels therein it would still be maritime.  See Second Bond
Decl. ¶¶ 7-8.  This would be a strange application of maritime
jurisdiction.  New Hampshire Co., 581 F.3d at 427 (citing Royal
Ins. Co. v. Pier 39 Ltd. P'ship, 738 F.2d 1035, 1036 (9th
Cir.1984) (noting that insurance for a beach house against
"perils of the sea" would almost certainly be outside maritime
jurisdiction)).  Applying the Second Circuit's threshold inquiry
would screen out such cases.

The Sixth Circuit test, however, appears more closely
tethered to Supreme Court precedent.  In New Hampshire Co. the
Sixth Circuit noted that the Supreme Court has declined to
endorse a threshold inquiry, and that it has stated that the
"nature and subject-matter of the contract at issue should be
the crucial consideration in assessing admiralty jurisdiction."

17

581 F.3d at 425 (quoting Exxon Corp., 500 U.S. at 611).  As the
Sixth Circuit explained, creating an additional threshold
inquiry may narrow the scope of maritime jurisdiction to the
point of contradicting the Supreme Court.  Id. (citing Kossick,
365 U.S. at 736-38) (ruling that a maritime employment contract
covered a dispute arising from events that occurred at a New
York hospital).  Indeed, the Second Circuit "note[d] some
uncertainty" as to whether the threshold inquiry survived Kirby,
and relied entirely on pre-Kirby cases from within its own
Circuit in determining such an inquiry was necessary.
Folksamerica, 413 F.3d at 312-313.

     Because the Sixth Circuit test appears more in line with
Supreme Court precedent, it is the one this Court adopts.  As
will be explained below, however, the Second Circuit test would
lead to the same result here because the nature of the dispute
is itself maritime.

     To begin, the 2018 Insurance Contract has the "genuinely
salty flavor" of a maritime contract.  Kossick, 365 U.S. at 742;
Sentry Select, 481 F.3d at 2020.  The 2018 Insurance Policy
covers six areas: Marina Operators Legal Liability, Protection &
Indemnity ("P&I"), Commercial General Liability ("CGL"),
Property, Equipment/Tools, and Owned Watercraft.  2018 Insurance
Contract 3.  KBS declined three types of coverage -- Boat
Dealers, Piers, Wharves and Docks, and Terrorism -- which shows

that all the types of coverage it did select were intentional.
Id.  The total yearly premium was $16,480, over half of which
($9,450) was for Marina Operator Legal Liability.  Id.  The
premium paid for portions of the policy can show their relative
importance.  See Sentry Select Co., 481 F.3d at 1219 (labelling
a portion of a policy dealing with employee liability
"insignificant" because the insurer "did not charge an increased
premium when the endorsement was added.").

 The Marina Operator Legal Liability section covers:

> the legal liability of the Insured as a marina
> operator for loss or damage to boats, engines,
> trailers, and outboard motors, the property of others,
> which are in its care, custody or control for purposes
> of repair, service, maintenance, consignment, storage,
> mooring, launching, hauling, fueling, docking, or
> other similar marina operations.

2018 Insurance Policy 12.  This coverage extends to the covered
premise as well as "property away from your premises in you or
your employees' custody for covered marina operations . . ."
Id.  The policy also covers pollution caused by vessels and
equipment.  Id. at 13.  There are several exclusions from
coverage, but damage to watercrafts is not among them.  Id. at
12-13.

 The second and eighth sections of coverage, for P&I and
Owned Watercraft, are indisputably maritime.  The P&I section
provides coverage for two Boston Whalers owned by KBS, id. at 2,
on both land and water, id. at 14.  The Owned Watercraft

Insurance covers damage to these watercraft, both on land and at
sea.  Id. at 103-105.  The total premium for these policies was
$811, about 5% of the total cost.  Id. at 4.

The third, sixth and seventh sections of coverage, for CGL,
Property, and Equipment/Tools, are not inherently maritime in
nature because they provide the kind of general insurance
available to any business, and coverage of a land-based
facility, even one involved in maritime commerce, is not
inherently maritime.  Id. at 3, 19-34 (CGL); 37-97 (Property);
98-105 (Equipment/Tools); see New Hampshire Ins. Co., 581 F.3d
at 430.  These policies together cost $6,219 per year, about 38%
of the total premium[5].  Id. at 4.  The three listed locations for
property coverage are 50 Great Western Road, Harwich, MA (the
main shop); 5-7 Rosemary LN, W. Yarmouth, MA (warehouse); and
the Barn.  Id. at 3, 6.  The majority of the cost of premiums
are for the main shop.  Id. at 6.

The primary object of this insurance policy thus was to
provide legal liability coverage for the operation of the
business, with the insurance of the buildings, equipment, and
owned vessels as secondary objectives.  As indicated by its 2015
application for insurance, the primary purpose of KBS's business

---

[5] The cost of Commercial General Liability is listed as
"Included" rather than being broken out into a specific dollar
figure.  2018 Insurance Policy 3.

was repair work, as the gross receipts for repair work were $220,000, versus $60,500 for storage and $57,500 for hauling/launching.  2015 Application 2.

Each component of the Legal Liability coverage, as applied to KBS, is marine in nature because it insures against maritime peril.  Contracts for repair of vessels already built certainly concern a maritime peril.  See Kossick, 365 U.S. at 735 (citing Endner v. Greco, 3 F. 411, 412-413 (S.D.N.Y. 1880)); Point Adams Packing Co. v. Astoria Marine Const. Co., 594 F.2d 763, 766 (9th Cir. 1979) (citing New Bedford Dry Dock Co. v. Purdy, 258 U.S. 96, 99 (1922)).  Insurance contracts covering "traditional marine risks" such as pollution and damage to watercrafts do as well.  Cf. Sentry Select, 481 F.3d at 1219 (explaining that an umbrella insurance policy's exclusion of "traditional marine risks" such as pollution and watercraft damage indicated it was not maritime).  That a contract includes land transportation does not alter its maritime nature.  Kirby, 543 U.S. at 27.

Most importantly, contracts for short-term or winter storage of vessels on land are maritime, when accompanied by repairs and servicing.  See Fireman's Fund American Ins. Co. v. Boston Harbor Marina, Inc., 285 F.Supp. 36, 39 (D. Mass. 1968) (Wyzanski, J.) (rev'd on other grounds 406 F.2d 917 (1st Cir. 1969) (upholding the jurisdictional analysis)).  As the Supreme Court explained over a century ago:

> [T]here is no difference in character as to repairs
> made upon the hull of a vessel dependent upon whether
> they are made while she is afloat, while in dry dock,
> or while hauled up by ways upon land.  The nature of
> the service is identical in the several cases, and the
> admiralty jurisdiction extends to all.

North Pacific S.S. Co. v. Hall Bros. Marine R. & Shipbuilding

Co., 249 U.S. 119, 128 (1912).[6]

Because the object of the contract was maritime, as were

the risks insured against, the contract falls under maritime

jurisdiction.

C.   **Choice of Law**

If a contract falls within the maritime jurisdiction of the

Court, it applies "federal maritime rules that are established

and settled; otherwise [it] would look to state law."  Catlin at

Lloyd's, 778 F.3d at 80.  In other words, state law controls

unless "an established maritime rule controls the disputed

issue, and that rule is materially different from state law."

Commercial Union Ins. Co. v. Pesante, 459 F.3d 34, 37 (1st Cir.

---

[6] There is language in New Hampshire Ins. that appears at
first glance to be helpful to KBS, namely that maritime
jurisdiction only extends to contracts covering a "particular
vessel."  581 F.3d at 431.  The court in Essex Ins., considering
a fact pattern very similar to the current case, makes a
convincing distinction by noting that the policy in New
Hampshire Ins. referred only to the marina as a whole, but the
insurance contract before that court insured vessels
collectively by covering loss or damage "[t]o watercraft and
equipment, cargoes, freights . . . ." 2012 WL 1893514, at *3.
The contract between Atlantic Specialty and KBS contains similar
language insuring vessels and cargo collectively.  2018
Insurance Policy at 12.

2006) (quoting <u>Windsor Mount Joy Mut. Ins. Co.</u> v. <u>Giragosian</u>, 57 F.3d 50, 54 (1st Cir. 1995)).  State law also controls if the dispute is "inherently local." <u>Kirby,</u> 543 U.S. 14, 22-23.  The First Circuit will conduct the "inherently local" inquiry only if a state has clearly expressed a rule contrary to the federal rule, or demonstrated a strong interest in a different rule. <u>Lloyd's of London</u>, 539 F.3d at 25.

Atlantic Specialty has cited two separate doctrines of maritime law as applicable to this case – the doctrine of the warranty of truthfulness, and the doctrine of <u>uberrimae</u> <u>fidei</u>. Pl.'s Mem. 10, 15-16.  Both doctrines relate to the circumstances under which an insurer may void a contract because of misstatements or omissions by the insured party, and both are clearly established in the First Circuit.  <u>See</u> <u>Catlin (Lloyd's)</u>, 778 F.3d at 80-81 (<u>Uberrimae</u> <u>fidei</u>); <u>Lloyd's of London</u>, 539 F.3d at 24 (promissory warranties); <u>see also</u> <u>Seguros</u> v. <u>Morales-Vazquez</u>, Civ. A. No. 15-2091, 2018 U.S. Dist. LEXIS 133864, at *33 (D. P. R. Aug. 7, 2018) (analyzing the warranty of truthfulness as a promissory warranty).

If both federal and state law arrive at the same result, to accommodate state interests, this Court may decide based on substantive the state law.  <u>Northern Assur. Co. of Am.</u> v. <u>Keefe</u>, 845 F. Supp. 2d 406, 413 (D. Mass. 2012) (citing <u>Kirby</u>, 543 U.S. at 27).

### D.    Count I: Misrepresentation of a Material Fact

Atlantic Specialty argues that the 2018 Insurance Policy is voidable under both maritime and Massachusetts law because KBS said it would not misrepresent any material facts, and then misrepresented that it would require customers to execute the Waiver and Storage Agreement.  Pl.'s Mem. 17.  KBS argues that it did not make any misrepresentations, that Atlantic Specialty did not rely on its statements in granting the insurance policy, that any breach did not increase the level of risk, and that its statements were not material.  Defs.' Opp'n 13-14.

Atlantic Specialty is correct that this policy is voidable under either Massachusetts or Federal law.  This court will therefore conduct its inquiry under the stricter Massachusetts standard, which necessarily satisfies the maritime standard.

### 1.    Legal Standard

"Under Massachusetts law, contract interpretation is a question of law for the court unless the contract is ambiguous." Nicolaci v. Anapol, 387 F.3d 21, 26 (1st Cir. 2004).  The language of a contract is ambiguous only if it is "susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one."  Barclays Bank PLC v. Poynter, 710 F.3d 16, 21 (1st Cir. 2013) (quoting Lass v. Bank of Am., N.A., 695 F.3d 129, 134 (1st Cir. 2012)). Contracts free from ambiguity are "interpreted according to

24

their plain terms" and courts "construe all words according to 'their usual and ordinary sense.'"  Barclays Bank PLC, 710 F.3d at 21 (internal citation omitted).  Words are interpreted "within the context of the contract as a whole, rather than in isolation."  Id.

Atlantic Specialty argues that it may void the insurance policy under maritime law because KBS breached the warranty of truthfulness.  Pl.'s Mem. 15.  Maritime law dictates that "'a breach of a promissory warranty in a maritime insurance contract excuses the insurer from coverage.'"  Maclean v. Travelers Ins. Co., 299 F. Supp. 3d 231, 234 (D. Mass. 2017) (Gorton, J.) (quoting Lloyd's of London, 539 F.3d at 24).

The relevant warranty is contained in the final section of the Policy: General Conditions of Coverage Applicable to all Coverage Sections.  Section X(7), titled "Concealment, Misrepresentation or Fraud," reads:

> This insurance Program shall be void as to all interests insured if, whether before or after a loss, any insured hereunder has concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interests of the insured therein, or in the case of any fraud or false swearing by any insured hereunder relating thereto.

2018 Insurance Policy 112.  The alleged misrepresentation at issue is KBS's claim that it would require customers to execute the Waiver and Storage Agreement.  Pl.'s Mem. 16.

Atlantic Specialty argues in the alternative that the
Policy is voidable under Massachusetts law because KBS violated
a "condition precedent," or because it increased the risk of
loss by misrepresenting material facts.  Pl.'s Mem. 17-20.

Under Massachusetts law, violation of a "condition
precedent" -- but not a "warranty" -- allows an insurance
company to void a policy:

> [A] statement made in an application for a policy of
> insurance may become a condition of the policy rather
> than remain a warranty or representation if: (1) the
> statement made by the insured relates essentially to
> the insurer's intelligent decision to issue the
> policy; and (2) the statement is made a condition
> precedent to recovery under the policy, either by
> using the precise words 'condition precedent' or their
> equivalent.

Northern Assur. Co. of Am, 845 F. Supp. 2d at 415 (quoting
Charles, Henry & Crowley Co. v. Home Ins. Co., 349 Mass. 723,
726 (1965).

Massachusetts law also allows a policy to be voided if the
insured breaches by making a material misstatement, but only if
that misstatement increases the risk of loss:

> No oral or written misrepresentation or warranty made
> in the negotiation of a policy of insurance by the
> insured or in his behalf shall be deemed material or
> defeat or avoid the policy or prevent its attaching
> unless such misrepresentation or warranty is made with
> actual intent to deceive, or unless the matter
> misrepresented or made a warranty increased the risk
> of loss.

Mass. Gen. L. Ch. 175, § 186.  See also Progressive Direct Ins.
Co. v. Martin, 425 F. Supp. 3d 48, 53 (D. Mass. 2019)
(Mastroianni, J.); Barnstable County Ins. Co. v. Gale, 425 Mass.
126, 128 (1997).  Atlantic Specialty has not alleged that KBS
intended to deceive.  See Pet.'s Mem. 19.

Section X(7) would qualify as a "condition precedent" under
Massachusetts law.  Atlantic Specialty argues the section meets
all the requirements of a condition precedent: it is in a
section labelled "General Conditions of Coverage," the language
"shall be void" is the equivalent of saying "condition
precedent," and it relates to the intelligent decision to issue
the policy.  Pl.'s Reply 10-14 (citing 2018 Insurance Policy
112; Charles, Henry & Crowley Co., 349 Mass. 723 (1965)).

Massachusetts case law indicates that parties can make a
warranty of truthfulness a condition precedent to a contract.
See Shurdut v. John Hancock Mut. Life Ins. Co., 320 Mass. 728,
732 (1947) ("The provisions of [section 186] . . . do not apply
where the truth of certain statements is made a condition
precedent to the reinstatement of the policy.").  The First
Circuit has held that the phrase "shall be void" can indicate a
condition precedent.  See Mass. Mut. Life Ins. Co. v.
Fraidowitz, 443 F.3d 128, 132 (1st Cir. 2006) (citing Lopardi v.
John Hancock Mut. Life Ins. Co., 289 Mass. 492 (1935)).  This is
because, the First Circuit explained, the phrase "shall be void"

makes coverage contingent on the insured meeting a related requirement, in that case a clause that rendered disability coverage inapplicable when the insurance applicant was already disabled while applying for the policy.  Id. at 131-133.  By the same logic, the "natural meaning" of the phrase "shall be void" in Section X(7) is to make insurance coverage contingent on truthfulness, and this clause is therefore a condition precedent.  Id. (quoting Lopardi, 289 Mass. at 495).

In other words, the equivalent of the maritime warranty of truthfulness is embedded in the contract and enforceable under Massachusetts law.  This Court will therefore conduct the remainder of its analysis for count I under Massachusetts law as it is not "materially different" from federal law.  Pesante, 459 F.3d at 37.

### 2.   Application

#### (a)   Misrepresentation

Atlantic Specialty characterizes KBS's alleged misrepresentation as follows: KBS represented to Atlantic Specialty that it would require customers to execute the Waiver and Storage Agreement, and it failed to do so.  Pl.'s Mem. 11.

The word "misrepresentation" does not invoke intent under either maritime or Massachusetts law.  See Catlin (Syndicate 2003) at Lloyd's v. San Juan Towing & Marine Services, Inc., 974 F. Supp. 2d 64, 78 (D.P.R. 2013) (noting, in the context of

28

uberrimae fidei, that misrepresentation can be due to "fraud, negligence, accident, or mistake."); Mass. Gen. L. Ch. 175, § 186.  KBS argues that this Court should consider "misrepresentation" to require intent, as in ordinary non-legal usage the term can imply an intentional lie.  See Defs.' Mem. 12.  If a contractual term is ambiguous the Court construes it against the insurance company as the drafter of the contract. See Littlefield v. Acadia Ins. Co., 392 F.3d 1, 6 (1st Cir. 2004).  This is true, however, only if "reasonably intelligent persons would differ as to which meaning is the proper one." Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998).  As the word "misrepresentation" is a defined legal term under both maritime and Massachusetts law, it is unreasonable to read into it an intent requirement wholly absent from the statutes and case law.

KBS asserts it is a disputed fact that it represented it would require customers to sign the Waiver and Storage Agreement.  Pl.'s SOF ¶ 17, Defs.' Disputed Facts ¶ 17.  It is not.  The loss control recommendations stated it was "Necessary" for KBS to "institute" an agreement that "should require" boat owners to sign hold harmless and indemnification language, and KBS responded by writing "Enclosed," and attaching the two agreements.  2016 Loss Fax 3.  By enclosing the documents, KBS objectively manifested assent to the terms.  See T.F. v. B.L.,

442 Mass. 522, 527 (2004) (citing Restatement (Second) of
Contracts § 19 (1981)). KBS argues that the use of the verb
"should" renders these terms merely advisory, Defs' Opp'n 9-11,
but words must be read in context, and the presence of
"Recommendation Grade: Necessary" immediately following the
clause containing the verb "should" shows that the instructions
were not mere suggestions. 2016 Loss Fax 2-4. Tellingly,
Anderson himself said in his deposition that he intended to
represent he would require customers to execute the Waiver and
Storage Contract. Pl.'s SOF, Ex. 5, Dep. of Karl Anderson at
64:3-64:20, ECF No. 26-7.

KBS also asserts it is a disputed fact that it failed to
execute the agreements with its customers. Pl.'s SOF ¶ 37;
Defs.' Disputed Facts ¶¶ 37. It is undisputed that KBS cannot
produce signed storage agreements for any of the third parties
making the claims giving rise to the current controversy. KBS
argues this evidence is inconclusive, that it indicates "simply
that Karl's Boat Ship could not produce documents." Defs.'
Opp'n 14. What is in evidence is that Anderson delegated the
signing of these documents to a subordinate, did not routinely
check that she was following his directive, and later fired her.
In other words, there is no evidence in the record that KBS <u>ever</u>
complied with its promissory representations. A company cannot
nullify its obligations by blaming an employee for failure to

comply.  This Court is only required to take "reasonable

inferences" in favor of the non-moving party, Maldonado-Denis,

23 F.3d at 581, and on this record it cannot reasonably infer

that KBS was complying with its promises (at the very least,

with respect to the parties whose property was damaged in the

fire).

    Under Massachusetts law, a party has breached a promissory

representation if it is not in "substantial compliance," a lower

standard than "absolute compliance."  See Hanover Ins. Co. v.

Treasurer & Receiver Gen., 74 Mass. App. Ct. 725, 732 (Mass.

App. Ct. 2009) (citing St. Paul Fire & Marine Ins. Co. v. Boston

Housing Authority, 25 Mass. App. Ct. 6, 12 n.7 (Mass. App. Ct.

1987).  The party seeking to void the insurance contract has the

burden of showing a lack of substantial compliance.  Hanover

Ins., 74 Mass. App. Ct. at 729.  In St Paul's Fire, the court

ruled that when the Boston Housing Authority's executives knew

employees were not enforcing required standards of compliance

for one of twenty-five accounts, it was not in substantial

compliance with a contract requiring that compliance.  25 Mass.

App. Ct. at 13-14.  In contrast, in Hanover Ins., the court

ruled that a government department was in substantial compliance

with its promise to conduct internal audits when its non-

compliance was unintentional and applied to only a small

fraction of its bank accounts.  74 Mass. App. Ct. at 732.

While KBS's failure to comply may not rise to the level of intentional neglect shown in St Paul's Fire, because it cannot produce its records, there is no evidence it substantially complied with its promises.  25 Mass. App. Ct. at 12.  It has therefore committed a misrepresentation in violation of Section X(7).

### (b).   Materiality

KBS argues its alleged failure was not material because Atlantic Specialty has failed to produce evidence of actual reliance, and has failed to produce evidence that its failure to execute storage agreements increased risk.  Defs.' Opp'n 13-15. Atlantic Specialty argues the breached promises were material because it would not have issued the policy had it known KBS did not intend to comply, and because KBS knew at the time that its representations were material.  Pl.'s Mem. 12-15.

The insurance contracts contain language indicating the misrepresentations were material, a question that is objective rather than subjective.  See Barnstable County Ins. Co., 425 Mass. at 128.  The insurance policy that Atlantic Specialty issued for the first time in 2015 (and has not been altered since) indicated it had the right to conduct inspections, give reports, and make recommendations.  2018 Insurance Policy 112; Anderson Affidavit ¶¶ 17-18.  The Policy explained that these inspections "relate only to insurability and premiums to be

32

charged." Id.  Regarding the importance of storage agreements
specifically, the application KBS submitted in 2015 includes
language stating: "If you provide any storage a copy of the
storage agreement is required for coverage to apply."
Application 20.  Thus, Atlantic Specialty put KBS on notice that
any forthcoming inspections could affect its insurability and
premiums, and that storage agreements were an area of particular
interest.  The actual language of Atlantic Specialty's
recommendations also indicates their necessity.  2016 Loss Fax
2-4.  The recommendations from Atlantic Specialty to KBS
included the following language: "Failure to respond may
jeopardize your insurance coverage," id. at 1, and the word
"Necessary" is repeated for each of the recommendations, id. at
2-3.  These are clear indicia of materiality.

Even though the test in Massachusetts is objective,
evidence of actual reliance indicates materiality.  See Bruno v.
Restuccia, No. 01-4906-E, 2003 Mass. Super. LEXIS 252, at *12
(Mass. Sup. Ct. Aug. 27, 2003), (Gershengorn, J.) (examining the
element of objective reliance in the context of fraud).  There
is ample evidence here of actual reliance.  Atlantic Specialty
has produced a declaration from an experienced underwriter,
Russell Bond, in which he states that the company would not have
permitted coverage if KBS had failed to respond to the loss
control survey or had represented that it would not comply with

the requirement that all customers execute the Waiver and
Storage Agreement.  Bond Decl.  ¶¶ 24-26.  The Court may
consider such evidence.  See Merchants Ins. Group v. Mr.
Cesspool, LLC, Civ. A. No. 08-cv-12040, 2010 U.S. Dist. LEXIS
72204, at *24-25 (D. Mass. 2010) (Woodlock, J.).  KBS has
produced no evidence to the contrary, and Bond's declaration
accords with the language of both the 2018 Insurance Policy and
the recommendations.[7]

Anderson, himself, believed in 2016 that the
representations were material.  In his deposition, he
acknowledged that he believed it was necessary to confirm the
loss control recommendations in order to receive insurance.
Pl.'s SOF, Ex. 5, Dep. of Karl Anderson 62:18-64:2, ECF No. 26-
7.  Anderson also acknowledged in that deposition that he
intended to represent he would require customers to execute the
Waiver and Storage Contract.  Id. at 64:3-64:20.  He further
acknowledged that he understood at the time that the insurance
company had requested the documents so he could be covered, and
that receiving these documents was "important" to the insurance
company.  Id., Ex. 8, Dep. of Karl Anderson 65:5-65:11, ECF No.

---

[7] KBS has questioned whether Bond need be qualified as an
expert under Fed. R. Civ. Proc. 26(b), see Joint Pretrial Mem.
15, ECF No. 35, but he need not be so qualified in order to
testify as to his personal knowledge of procedures in place at
his own company.  See Merchants Ins. Group, 2010 U.S. Dist.
LEXIS 72204, at *24-25.

26-10.  Similarly, elsewhere in the deposition he stated he sent
the 2016 Loss Fax "[t]o comply with their recommendations" in
order "[t]o be insured," and that the fax was required.  Id.,
Ex. 12, Dep. of Karl Anderson 63:10-64:2.

This combination of undisputed objective and subjective
evidence shows materiality.

KBS argues the policy is not voidable because any
misrepresentations were not made in connection with applying for
insurance.  Defs.' Opp'n 9 (quoting Ingersoll Milling Mach. Co.
v. M/V Bodena, 829 F.2d 293, 308 (2d Cir. 1987) (defining
uberrimae fidei as applying to a party "seeking marine
insurance").  This misconstrues the standard because the
contractual language of the insurance policy required KBS to
refrain from either misrepresenting or concealing material
facts.

In Quincy Mut. Fire Ins. Co. v. Quisset Props. The
Massachusetts Appeals Court analyzed whether a policy could be
voided under section 186 when an insurance company automatically
renewed a car insurance policy without conducting any inquiry as
to whether material facts had changed.  69 Mass. App. Ct. 147,
148 (Mass. App. Ct. 2007).  In that case, the owner of a car
that was insured through a business never informed his insurer,
through multiple periods of automatic renewal, that the business
had dissolved.  Id. at 151.  Since the insurer never made any

35

requests for information after the initial application, the
court held that the car-owner did not make any
"misrepresentations." Id. at 153.  As the court explained:

> when neither a policy provision nor a renewal
> application requires the insured to provide updated
> information to the insurer, the insured's failure to
> do so is not a misrepresentation within the meaning of
> G. L. c. 175, § 186.  In such circumstances, the onus
> is on the insurer to identify the information that it
> considers material and request from the insured
> updated information concerning any changes.

Id.  Thus, the focus is on whether an inquiry occurred at all,
not whether it occurred specifically within an application.  As
the Supreme Judicial Court has explained, "when an insured makes
a material misrepresentation during the application or renewal
period for an insurance policy, the insurer may be able to deny
coverage on that basis." Commerce Ins. Co. v. Gentile, 472
Mass. 1012, 1015 (2015) (emphasis added).

The inquiry under Massachusetts law proceeds in three
parts.  First, KBS agreed not to "conceal" any material facts,
2018 Insurance Policy 112, a contractual "policy provision" that
imposes a higher affirmative duty than the baseline
Massachusetts law.  See Quincy Mut. Ins., 69 Mass. App. Ct. at
153.  Second, by responding to Atlantic Specialty's loss control
survey in 2016, KBS represented during the 2017 renewal period –
- in response to an affirmative inquiry by Atlantic Specialty --
that it would comply with the loss control survey

recommendation, a material requirement.  Third, KBS breached

Section X(7) in 2017, during the 2018 renewal period, by

concealing its material failure to adhere to Atlantic

Specialty's loss control recommendations.  KBS has stated that

Heather Brown was responsible for executing the agreements

during the "relevant time."  Def.'s Response Interrogatories 15-

23.  In his deposition, Anderson stated that to the best of his

recollection she left in 2017.  Anderson Dep., 32:8-32:18.

Thus, based on Anderson's testimony KBS failed to adhere to the

agreements prior to the 2018 issuance of the policy.

In conclusion, Atlantic Specialty has met its burden to

show that KBS breached a condition precedent to the contract by

committing material misrepresentations and concealments, which

means the contract is voidable.

### E. Count II: **Uberrimae Fidei**

KBS argues that, even if maritime law applies, the parties

have contracted around uberrimae fidei, and the doctrine is

obsolete and ought no longer be applied.  Defs.' Opp'n 15.

Uberrimae fidei is the doctrine of utmost good faith under

maritime law.  QBE Seguros v. Morales-Vázquez, Civ. No. 15-2091,

2017 U.S. Dist. LEXIS 189273, at *3 (D. P.R. Nov. 14, 2017).

"Under this doctrine, the insured is required 'to disclose to

the insurer all known circumstances that materially affect the

insurer's risk, the default of which . . . renders the insurance

37

contract voidable by the insurer.'" _Pesante_, 459 F.3d at 37
(1st Cir. 2007) (quoting _Windsor Mount Joy Mut. Ins. Co._ v.
_Giragosian_, 57 F.3d 50, 54-55 (1st Cir. 1995)).  To show a
breach of the duty of utmost good faith, the insurer must show
that the insured misrepresented or concealed a material fact.
_QBE Seguros,_ 2017 U.S. Dist. LEXIS 189273, at *4.  Whether a
fact is material is judged objectively.  _St. Paul Fire & Marine
Ins. Co._ v. _Halifax Trawlers, Inc.,_ 495 F. Supp. 2d 232, 240 (D.
Mass. 2007).

   The language contained in Section X(7) of the 2018
Insurance Agreement essentially reflects the doctrine of
_uberrimae fidei_.  _See_ 2018 Insurance Policy 112.  KBS's
protestation to the contrary, _see_ Defs.' Opp'n 12, requires
reading an intent requirement into the words "conceal" and
"misrepresent" that has no basis in case law.  _Compare_ _Quintero_
v. _Geico Marine Ins. Co.,_ 389 F. Supp. 3d 1153, 1160 (S.D. Fl.
2019) (ruling similar language in an insurance contract
reflected the doctrine of _uberrimae fidei_ because it lacked the
word "intent") _with_ _King_ v. _Allstate Ins. Co.,_ 906 F.2d 1537,
1539 (11th Cir. 1990) (ruling parties had contracted around
maritime law when policy became void if insured "intentionally"
concealed or misrepresented material facts).  With respect to
the timing of the misrepresentation, _see_ Defs.' Opp'n 12,
_uberrimei fidei_ applies if misrepresentations are made in a

request for renewal, or if concealment occurs after the
insurance policy goes into effect.  See Fireman's Fund Ins. Co.
v. Great Am. Ins. Co., 822 F.3d 620, 633-34, 638-640 (2nd Cir.
2016); Quintero, 389 F. Supp. 3d at 1162; Reliance Ins. Co. v.
McGrath, 671 F. Supp. 669, 676 (N.D. Cal. 1987).

The First Circuit currently has pending an appeal of QBE
Seguros, 2017 U.S. Dist. LEXIS 189273, a case that applied
uberrimae fidei.  See QBE Seguros v. Morales-Vasquez, No. 19-
1503 (1st Circuit).  KBS asks this Court to review the arguments
made by the parties there and overturn the doctrine.  Defs.'
Opp'n 15.

The Appellant's brief raises two relevant issues.  The
first is whether the doctrine of uberrimae fidei is now obsolete
because English law no longer recognizes a duty of utmost fair
dealing in insurance contracts, and the Supreme Court has
instructed federal courts to keep admiralty law in harmony with
the laws of England.  See Brief for the Appellants 22-23, QBE
Seguros, No. 19-1503 (citing Wilburn Boat Co. v. Fireman's Fund
Ins. Co., 348 U.S. 310, 325 (1955) (Reed, J., dissenting) and
id. at 323 (Frankfurter, J., concurring)).  The district court
rejected this argument because the First Circuit has expressly
adopted uberrimae fidei.  See Opinion and Order, QBE Seguros, at
4-7, Civ No. 15-2091, ECF No. 80 (D. P.R. Sep. 28, 2016)
(McGiverin, M.J.) (citing Catlin (Lloyd's), 778 F.3d at 80-81).

It also rejected the argument that the Supreme Court "commanded federal courts to follow in step with the latest developments of English marine insurance law so as to ensure uniformity in the marine insurance market . . ." by noting that the Supreme Court does not require American federal courts to "follow House of Lords' decisions automatically." Id. at 6 (quoting Standard Oil Co. of N.J. v. United States, 340 U.S. 54, 59 (1950)) (emphasis supplied by district court).

The second issue is whether uberrimae fidei allows an insurer to void a policy only if it actually relied on a misstatement of fact. See Appellant's Brief 37-40, QBE Seguro, No. 19-1503. Several other circuits include reliance as an element of uberrimae fidei. See St. Paul Fire & Marine Ins. Co. v. Abhe & Svoboda, Inc., 798 F.3d 715, 720-21 (8th Cir. 2015); Puritan Ins. Co. v. Eagle S.S. Co. S.A., 779 F.2d 866, 871 (2d Cir. 1985) (quoting Rose and Lucy, Inc. v. Resolute Insurance Co., 249 F. Supp. 991, 992 (D. Mass. 1965) (Ford, J.). The applicable First Circuit case, Catlin (Lloyd's), makes no mention of reliance, however. 778 F.3d at 83. The District Court in QBE Seguro took this to mean that reliance is not an element, pointing out that the First Circuit's analysis included asking whether the insurer "could have reasonably" made assumptions and evaluations based on insured's misrepresentations. 2017 U.S. Dist. Lexis 189273, at *10

(citing Catlin (Lloyd's), 778 F.3d at 83) (emphasis supplied by
the District Court).  This objective test of materiality
excludes reliance as an element.

This Court considers the analysis by Magistrate Judge
McGiverin eminently convincing.  Furthermore, it is bound to
follow precedents established by the First Circuit, United
States v. Moore-Bush, 963 F.3d 29, 37 (1st Cir. 2020) and the
First Circuit recognizes uberrimae fidei as established
doctrine, without reliance as an element.  See Catlin (Lloyd's),
778 F.3d at 80-83.  This Court therefore applies the doctrine as
promulgated by the First Circuit.

As KBS failed to disclose to Atlantic Specialty that it was
in material breach of the contract due to its failure to execute
the storage agreements, Atlantic Specialty therefore may also
void the contract under uberrimae fidei.

## IV. Conclusion

In conclusion, this Court GRANTS summary judgment in favor
of Atlantic Specialty, and DENIES summary judgment as to KBS.
Accordingly, this Court enters a declaratory judgment that
Atlantic Specialty has no obligations to KBS under the 2018
Insurance Policy, that the 2018 Insurance Policy is voidable due
to violation of uberrimae fidei and condition precedent within
the contract, and that Atlantic Specialty has no duty to provide

coverage, defend, or indemnify KBS with respect to third-party

claims.

   **SO ORDERED.**


                                        /s/ William G. Young
                                        WILLIAM G. YOUNG
                                        DISTRICT JUDGE